**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

_____

IN RE: AUTOMOTIVE PARTS
ANTITRUST LITIGATION                         MASTER FILE NO. 12-md-02311


_____

In Re: Heater Control Panels                 HON. MARIANNE O. BATTANI


_____

THIS DOCUMENT RELATES TO:                    2:12-cv-00401

Direct Purchaser Actions

_____/

### OPINION AND ORDER DENYING DEFENDANTS' COLLECTIVE
### MOTION TO DISMISS DIRECT PURCHASER ACTIONS

Before the Court is Defendants' Collective  Motion to Dismiss Direct Purchaser

Plaintiffs' (DPPs) Amended Class Action Complaint (12-401, Doc. No. 59).  The Court

heard oral argument on November 13, 2013, and at the conclusion of the hearing, took

this matter under advisement.  For the reasons that follow, the motion is **DENIED**.

## I.  INTRODUCTION

On February 7, 2012, the United States Judicial Panel on Multidistrict Litigation

("Judicial Panel" or "Panel")  transferred actions sharing "factual questions arising out of

an alleged conspiracy to inflate, fix, raise, maintain, or artificially stabilize prices of

automotive wire harness systems" to the Eastern District of Michigan.  (12-md-02311,

Doc. No. 2).  In its transfer order, the Judicial Panel noted that the majority of cases

were pending in the Eastern District, as was the first filed action, that several defendants were located in this district, and that a related criminal investigation was underway in this district.  (Id.)  The Panel determined that centralizing litigation in this District would eliminate duplicative discovery, prevent inconsistent pretrial rulings and conserve resources.  (Id.)   After complaints were filed alleging conspiracies to fix prices of three additional component parts, the Judicial Panel determined that including all actions in MDL No. 2311 would result in the most efficient handling of the case.  The Judicial Panel noted the existence of similar conspiracies with overlapping defendants arising from the same government investigation as well as an overlap of parties and counsel.  The additional component part cases were transferred to this Court for coordinated pretrial proceedings, and In re: Automotive Wire Harness Systems Antitrust Litigation was renamed "In re: Automotive Parts Antitrust Litigation."  (Doc. No. 117 in 12-2311).  There are now twenty-eight component part cases pending.  (See Doc. No. 665 in 12-2311).

On February 28, 2013, Direct Purchaser Plaintiffs filed their Amended Class Action Complaint ("ACAC") for the Heater Control Panels.  (Doc. No. 45 in 12-401). Collective Defendants assert that the Direct Purchasers' ACAC must be dismissed for four reasons:  it fails to meet the minimum requirements for pleading an antitrust conspiracy; damages are unavailable to DPPs because they lack standing to bring a claim for money damages under the Sherman Act; the statute of limitations bars claims accruing before June 28, 2008; and DPPs are not entitled to injunctive relief because the allegations of threatened future injury are not plausible.

Because the same arguments were raised and addressed in the Court's prior ruling on a motion to dismiss the wire harness direct purchaser plaintiffs' complaint, the Court relies on the analysis from the opinion to the extent that no distinction between the two cases is needed.

## II. FACTUAL ALLEGATIONS

The ACAC contains party allegations, class allegations, and allegations about the product, the nature of the conspiracy, the market conditions, and guilty pleas entered by Defendants.  The allegations are set forth below.

### A.  The Parties

Direct Purchaser Plaintiffs, Tiffin Motor Homes, Inc. ("Tiffin")  and SLTNTRST LLC (the "Trust"), the Trustee for the bankrupt Fleetwood Enterprises, Inc. bring this class action against Defendants for damages and injunctive relief under the antitrust laws of the United States arising out of DPPs' purchase of Heater Control Panels ("HCPs"), the collection of buttons and switches in the center console of automobiles that provide interior climate control.  (Doc. No. 45 at ¶ 3).  Plaintiffs are manufacturers of motor homes; they are not suppliers to any automobile makers.  (Doc. No. 659 in 12-2311, Tr. at 138).

According to the ACAC (Doc. No. 45 at ¶ 1), Defendants manufactured or sold HCPs in the United States and include Denso Corporation, Denso International America, (collectively "Denso") Sumitomo Electric Industries, Ltd., Sumitomo Electric Wiring Systems, Inc., Sumitomo Wiring Systems, Ltd, (collectively "Sumitomo") Tokai Rika Co., Ltd, and Tran, Inc. (collectively "Tokai Rika").  DPPs allege that others

3

participated in the conspiracy, and Defendants are jointly and severally liable.  (Doc. No. 45 at ¶ 26).

### B.  Class Allegations

Tiffin alleges that it purchased HCPs "directly from one or more Defendants and/or their co-conspirators during the Class Period," (Doc. No.  45 at ¶ 13).  The Trustee alleges that Fleetwood was a leading producer of recreational vehicles, motor homes, and travel trailers, and also purchased HCPs directly from Defendants or co-conspirators during the class period.  (Id. at ¶ 14).  The Class Period is identified as early as January 1, 2000, until at least February 28, 2010.  (Doc. No. 45 at ¶ 7).

### C.  Product and Nature of the Conspiracy

DPPs claim that they were injured by a conspiracy among Defendants to fix prices on HCPs.  Original equipment manufacturers (OEMs) install HCPs in new motor vehicles as part of the manufacturing process.  (Doc. No. 45 at ¶ 40).  In addition HCPs "are installed in motor vehicles to replace worn out, defective, or damaged HCPs." (Doc. No. 45 at ¶ ).  HCPs "are not functionally distinguishable in any material respect." (Doc. No. 45 at ¶ 41).

According to DPPs, Defendants met and discussed bids and price quotations for HCPs sold in the United States (Doc. No. 45 at ¶¶ 53, 54).  Defendants agreed to coordinate price adjustments requested by OEMs in the United States (Doc. No. 45 at ¶ 55).  The conspiracy involved manipulation of the Request for Quotation ("RFQ") process.  Typically, the RFQ process begins three years before vehicle production. (Doc. No. 45 at ¶ 62).  An OEM issues the RFQ to multiple suppliers, who submit bids

4

and revised bids prior to the selection of the winning bid.  (Id.)  The bid holds through the life of the vehicle model, on average five years.  (Id.)  In addition, suppliers that were not awarded the bid purchase HCPs from the winning bidder, and pay, at a minimum, the winning price.  (Doc. No. 45 at ¶ 65).

### D.  Market Conditions and Investigation

DPPs allege that market conditions are conducive to collusion.  Defendants control a majority of the market.  (Doc. No. 45 at ¶ 44).  There are significant barriers to entry in the market for HCPs: significant start-up capital expenditures; concentration in the market; (Doc. No. 45 at ¶¶ 43-44); relatively inelastic pricing, and a lack of viable substitute products.  (Doc. No. 45 at ¶¶ 45-46).

DPPs assert that Sumitomo and Denso have histories of collusion and have been involved in antitrust investigations with respect to other automotive parts (id. at ¶¶ 47-50).  Denso and two of its employees pleaded guilty to rigging bids and fixing prices on HCPs sold to "an automobile manufacturer."  (Doc. No. 45 at ¶ 79, 84-86).  The employees pleading guilty worked in Toyota Sales Division.  (Doc. No. 45 at ¶ 85-86).  Tokai Rika also pleaded guilty to the same conspiracy relative to Toyota.  (Doc. No. 45 at ¶ 89).  The price-fixing is alleged to have impacted multiple bids submitted to OEMs as well as the prices paid by all direct purchasers.  (Doc. No. 45 at ¶ 72).

## III.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) allows district courts to dismiss a complaint when it fails "to state a claim upon which relief can be granted."  When reviewing a motion to dismiss, the Court "must construe the complaint in the light most

favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Although the federal procedural rules do not require that the facts alleged in the complaint be detailed, "'a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do.' " Twombly, 550 U.S. at 555; Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  Under Iqbal, a civil complaint will only survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. . . .  Exactly how implausible is 'implausible' remains to be seen, as such a malleable standard will have to be worked out in practice." Courie v. Alcoa Wheel & Forged Prods., 577 F.3d 625, 629-630 (6th Cir. 2009).

## IV.  ANALYSIS

### A.  Plausibility of the Antitrust Claim

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1.  In Twombly, the Supreme Court considered the pleading requirements needed to withstand a motion to dismiss a Section 1 Sherman Act claim.  It held that a complaint must contain "enough factual matter (taken as true) to suggest" the existence of an agreement.  550 U.S. at 556.

6

> Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.

Id.

The Court begins its analysis here, as it did in the wire harness case, with a recap of the facts before the Supreme Court in Twombly.  The plaintiffs brought a consumer antitrust class action against local telephone and telecommunications carriers alleging the defendants conspired to restrain trade.  According to the plaintiffs, the defendants engaged in parallel conduct to "inhibit the growth" of companies new to the market and agreed not to compete with each other.  550 U.S. at 550-551.  The defendants moved to dismiss the complaint on the ground that it failed to include factual allegations from which an express or tacit agreement could be inferred.  Id. at 552.  The Supreme Court observed that "[a]n antitrust conspiracy plaintiff with evidence showing nothing beyond parallel conduct is not entitled to a directed verdict. . . [and] proof of a § 1 conspiracy must include evidence tending to exclude the possibility of independent action."  Id. at 554 (citation omitted). The Twombly Court added that "at the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently."  Id. (citing Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)).

Because the Supreme Court dismissed the antitrust claim in Twombly, the decision does not stand as an example of the type of allegations that would satisfy the

7

plausibility standard.  Nevertheless, the Supreme Court provided general guidance.  It indicated that a "heightened fact pleading of specifics" is not needed to state an antitrust conspiracy claim, 550 U.S. at 570, although parallel behavior is not enough.

Collective Defendants maintain that the ACAC does not satisfy Ashcroft v. Iqbal, 556 U.S. 662 (2009); however, Iqbal did not alter the pleading requirements set forth in Twombly.  Iqbal answered the question of whether Twombly was limited to antitrust claims or applied universally.  Iqbal, 556 U.S. at 684.  The Supreme Court summarized its decision in Twombly as follows:

> Our decision in Twombly illustrates the two-pronged approach. There, we considered the sufficiency of a complaint alleging that incumbent telecommunications providers had entered an agreement not to compete and to forestall competitive entry, in violation of the Sherman Act, 15 U.S.C. § 1. Recognizing that § 1 enjoins only anticompetitive conduct 'effected by a contract, combination, or conspiracy," Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 775, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), the plaintiffs in Twombly flatly pleaded that the defendants 'ha[d] entered into a contract, combination or conspiracy to prevent competitive entry. . .and ha[d] agreed not to compete with one another.'  550 U.S., at 551, 127 S.Ct. 1955 (internal quotation marks omitted). The complaint also alleged that the defendants' 'parallel course of conduct. . .to prevent competition' and inflate prices was indicative of the unlawful agreement alleged.  Ibid. (internal quotation marks omitted).
>
> The Court held the plaintiffs' complaint deficient under Rule 8. In doing so it first noted that the plaintiffs' assertion of an unlawful agreement was a 'legal conclusion' and, as such, was not entitled to the assumption of truth.  Id., at 555, 127 S.Ct. 1955. Had the Court simply credited the allegation of a conspiracy, the plaintiffs would have stated a claim for relief and been entitled to proceed perforce. The Court next addressed the 'nub' of the plaintiffs' complaint "the well-pleaded, nonconclusory factual allegation of parallel behavior' to determine whether it gave rise to a 'plausible

8

> suggestion of conspiracy.' <u>Id.</u>, at 565-566, 127 S.Ct. 1955. Acknowledging that parallel conduct was consistent with an unlawful agreement, the Court nevertheless concluded that it did not plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior. <u>Id.</u>, at 567, 127 S.Ct. 1955.  Because the well-pleaded fact of parallel conduct, accepted as true, did not plausibly suggest an unlawful agreement, the Court held the plaintiffs' complaint must be dismissed.  <u>Id.</u>, at 570, 127 S.Ct. 1955.

<u>Iqbal</u>, 556 U.S. at 679-80.

This Court rejected the wire harness defendants' argument that <u>Twombly</u> required dismissal of the wire harness case.  This Court held the case could proceed because the complaint included sufficient allegations to inform the defendants what wrongdoing they were alleged to have committed and enabled the defendants to respond to the allegations.  Further, the Court concluded that after reviewing the allegations together,  the complaint contained plausible grounds to infer an agreement. Plausible grounds were set forth in allegations about the government investigations, which were used to bolster the plausibility of § 1 claims; the guilty pleas by multiple defendants; the structure of the wire harness industry; and the allegations demonstrating Defendants' opportunity to meet and collude.

Although DPPs advance similar allegations here, Collective Defendants argue that distinctions in the allegations advanced in this case warrant dismissal.   At oral argument Collective Defendants highlighted the differences between the HCP ACAC and the wire harness complaint.  The distinctions include the status of the direct purchaser plaintiffs, the market allegations, and the customized nature of HCPs.  The Court discusses the distinctions below.

9

### 1.  Status of Purchasers

Collective Defendants distinguish the DPPs here in that neither Tiffin nor
Fleetwood makes automobiles nor supplies automakers.  Further, Collective
Defendants point to the absence of allegations regarding whether DPPs purchased
HCPs for new vehicles or repair parts, what prices were paid, or from whom the
purchases were made.  DPPS merely allege they purchased HCPs from "one or more
Defendants and/or their co-conspirators." (Doc. No. 45 at ¶¶ 13, 14).

Despite Collective Defendants' litany as to missing allegations, there is no
heightened pleadings requirement for stating an antitrust claim.  That standard does not
change because a plaintiff has had access to documents from a government
investigation.  Here, DPPs allege that they purchased HCPs directly from one or more
Defendants and/or their co-conspirators during the relevant time period.  (Doc. No. 45
at ¶¶ 13-14).  They have satisfied their pleading burden.  See Starr v. Sony BMG Music
Entertainment, 592 F.3d 314, 325 (2d Cir. 2010) (rejecting the contention that Twombly
requires a plaintiff  to identify specifically the time, place, or person related to each
allegation of conspiracy);

### 2.  Market Allegations

The direct purchaser plaintiffs' complaint in the wire harness case included
allegations of the market share of each defendant, which combined reached 66%.  In
contrast, DPPs allege in their ACAC that Defendants "control a majority" of the market.
(Doc. No. 45 at ¶ 44).  Collective Defendants assert that the lack of specificity
undermines a basis to assess the size of the market or the number of other suppliers in

10

the heater control panel market.

In this case, Direct Purchaser Plaintiffs include allegations reflecting a market conducive to the type of collusive activity that took place:  the market is highly concentrated, with high barriers to entry, and inelastic pricing.  (Doc. No. 45 at ¶¶ 43-46).  A review of case law demonstrates that these allegations meet DPPs' pleading burden.  See Starr, 592 F.3d at 323-24 (citing studies showing coordinated price increases likely when four leading firms controlled 50-80% of market); In re Packaged Ice Antitrust Litig., 723 F. Supp. 2d 987, 1014 (E.D. Mich. 2010) ("oligarchic sellers" conducive to collusion as are "prohibitive entry barriers"); Standard Iron Works v. Arcelormittal, 639 F. Supp. 2d 877, 883 (N. D. Ill. 2009) ("high barriers to entry" conducive to collusion); In re Carbon Black Antitrust Litig., No. A-03-10191, 2005 WL 102966 at *6 (D. Mass. Jan. 18, 2005) (denying motion to dismiss because the plaintiffs alleged, among other things, market conditions that would facilitate the maintenance of an illegal agreement).

### 3.  Characteristics of HCPs

The direct purchaser plaintiffs in the wire harness case alleged that wire harnesses are interchangeable between cars and that manufacturers are capable of producing the product for use in any motor vehicle.  According to Collective Defendants, in this case, DPPs gloss over the distinction between those allegations and the allegations relative to HCPs, which are described as "not functionally distinguishable." Collective Defendants maintain that the allegation simply means HCPs do the same thing, not that they are interchangeable.

Even if heater control panels are highly customized products, the lack of fungibility is not dispositive.  DPPs' position is that HCPs are no more customized that wire harnesses.  (Doc. No. 659, Tr. at 142-43).  They contend bids were rigged on the underlying plastic component regardless of upgrades for particular models.  (Id.)  DPPs allege that they purchased HCPs within the time period of the conspiracy alleged in the complaint.  The market is conducive to antitrust behavior.  Finally, the guilty pleas already entered in this litigation, when considered with the other factors, push the complaint past the plausibility standard.

### 4.  Guilty Pleas/Global Nature of the Conspiracy

It is undisputed that price-fixing in the HCP market occurred.  In their plea agreements, Denso, its executives, and Tokai Rika admit they coordinated price quotes for HCPs in response to certain Requests for Quotation ("RFQ") issued by Toyota, on a model-by-model basis.  In addition, DPPs argue that Sumitomo Electric Industries Ltd. is cooperating with investigating authorities.  DPPs detail the content of the guilty pleas to demonstrate the elements of their antitrust claim.  Defendants admitted they met and agreed to allocate supply, rig bids, and fix prices of heater control panels.  In addition, Tokai Rica pleaded guilty to obstruction of justice in that it destroyed electronic data and paper documents "likely to contain evidence of antitrust crimes in the Untied States and elsewhere."  (Doc. No. 45 at ¶ 88).

The parties disagree as to how far these pleas can be stretched.  Collective Defendants assert that the DPPs have overreached in the ACAC in that the factual allegations do not support the existence of a conspiracy beyond limited models manufactured by Toyota and these Defendants.  The Court disagrees.

12

The content of the guilty pleas does not render a conspiracy beyond Toyota implausible.  In their Complaint, DPPs link the guilty pleas regarding HCPs sold to Toyota to other new cars, to RVs, and to repair parts in the aftermarket.  For example, in Paragraph 114, DPPs allege that they "paid more for HCPs than otherwise would have been the case in a competitive market." (Doc. No. 45).  In Paragraph 71, DPPs allege that "Defendants and their co-conspirators knew and intended that their actions regarding the sale of HCPs to motor vehicle manufacturers would have a direct impact on prices for HCPs sold to all direct purchasers of HCPs throughout the United States." (Doc. No. 45).  Lastly, in Paragraph 72, DPPs allege the conspiracy "impacted not only multiple bids submitted to OEMs, but also the prices paid by all other direct purchasers of HCPs" and that the scheme "succeeded, and affected the prices for all HCPs."  (Doc. No. 45).

A review of these factual allegations and the inferences favorable to DPPs, which must be drawn by the Court, distinguish this case from those relied upon by Collective Defendants.  Specifically, this case presents "the 'larger picture' from which inferences of a wider conspiracy can be drawn. . . ."  In re Iowa Ready-Mix Concrete, 786 F. Supp. 2d 975, 979 ( N.D. Iowa 2011) (involving bilateral agreements and geographically limited market).  The ongoing investigation into price-fixing in automotive component parts has resulted in myriad guilty pleas.  Here, the ACAC describes the guilty pleas of several Collective Defendants and their executives.  The executives admitted they met and agreed to allocate supply, rig bids, and fix prices for HCPs. Consequently, the viability of DPPs' ACAC does not build on allegations of parallel conduct.  Compare In re Travel Agent Commission Antitrust Litig., 583 F.3d 896 (6th

13

Cir. 2009) (alleging only parallel conduct with "no setting" to suggest the existence of an agreement). Collective Defendants have notice of which Defendants already pleaded guilty to antitrust conduct in the relevant market. Although DPPs have alleged a conspiracy that expands beyond price-fixing HCPs sold to Toyota, they have limited their claims to defendants operating in the HCP market. Compare In re TFT-LCD (Flat Panel) Antitrust Litig., MDL No. 1827, 2010 WL 2629728 (N.D.Cal. June 29, 2010) (rejecting the plaintiffs' position that the defendants' involvement in a conspiracy relating to one product renders more plausible a conspiracy claim relating to a product deemed a close substitute). The ACAC identifies the time frame of the conspiracy, and the market conditions that support the plausibility of a broader conspiracy than that to which Defendants have pleaded guilty. In contrast to the plaintiffs in Twombly, Defendants admitted to meetings and conversations with co-conspirators. (Doc. No. 45 at ¶¶ 85, 86), and the guilty pleas make clear that at least two of the three groups of defendants availed themselves of the opportunities.

When read in its entirety, the allegations in the ACAC articulate a plausible antitrust claim based upon the market structure, the government investigations, and the guilty pleas. Compare In re Air Cargo Shipping Servs. Antitrust Litig. No. MD 06-1775, 2009 WL 3443405 at *1 (E. D. N. Y. Aug. 21, 2009) (holding that admissions of price-fixing by so many defendants rendered a conspiracy claim plausible). At this stage of the litigation, these allegations are sufficient. DPPs identified the parties to the conspiracy, the products involved, the geographic market affected, and the time frame of the conspiracy. DPPs also alleged methods used to implement the conspiracy.

Not only do Collective Defendants have notice of the claims against them, the

14

allegations create "a reasonable expectation that discovery may reveal further evidence of an illegal agreement."  In re Packaged Ice Antitrust Litig., 723 F. Supp. 2d at 1007-08. The fact that Defendants did not plead guilty to wide-ranging conduct does not limit the civil action.  Id. at 1011.  Relatively few defendants plead guilty to all of the charges against them, and limitations on government resources may play as much a role in the agreement as the conduct involved.  In re High Fructose Corn Syrup Antitrust Litig., 295 F.3d 664-665 (7th Cir. 2002).  The key to the ACAC's survival is whether it contains plausible grounds to infer an agreement; not whether an agreement is probable.  In re Travel Agent Comm'n Antitrust Litig., 583 F.3d 896, 907 (6th Cir. 2009).  Such grounds exist.

### B.  Viability of Claim for Damages

The parties dispute whether DPPs may bring a claim for damages under the Sherman Act, which requires DPPs to demonstrate they have antitrust standing.  See Static Control Components, Inc. v. Lexmark Int'l, Inc., 697 F.3d 387, 402 (6th Cir. 2012) aff'd on other grounds, 2014 WL 1168967 (S. Ct. March 25, 2014).  "[S]tanding in an antitrust case is more onerous than the conventional Article III inquiry."  NicSand, Inc. v. 3M Co., 507 F.3d 442, 450 (6th Cir. 2007) (en banc).

In Static Control Components, 697 F.3d at 402, the Sixth Circuit addressed the factors assessed and balanced when deciding whether a claimant has satisfied his burden to adequately plead antitrust standing.  First, the plaintiff must allege "the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused."  Id.   Second, the court considers "the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in

15

the relevant market."  Third, the court looks at "the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative."  Fourth, the court must assess "the potential for duplicative recovery or complex apportionment of damages."  Finally, the court must consider "the existence of more direct victims of the alleged antitrust violation."  Id. (citations omitted).

After reviewing the allegations set forth in the ACAC, the Court is satisfied that DPPs have adequately pleaded antitrust standing.  First, the complaint includes allegations that each DPP purchased HCPs directly from one or more of the Defendants and/or co-conspirators during the Class Period (Doc. No. 45 at ¶ 114), and that Defendants' conspiracy impacted the prices DPPs paid for HCPs. (Doc. No. 45 at ¶¶113, 122).  The allegations of price increases satisfies DPPs' burden.  See In re Ductile Iron Pipe Fittings (DIPF) Direct Purchaser Antitrust Litig., CIV. 12-711, 2013 WL 812143 (D.N.J. Mar. 5, 2013) (finding it unnecessary for the direct purchasers to "state the actual price that they paid" because they alleged the purchases were made directly from the defendants during the time frame of the conspiracy to fix prices).  Moreover, because DPPs purchased HCPs directly from Defendants, there is no need for complex apportionment of damages.  As direct purchasers they are direct victims of the alleged conspiracy.

The balancing test is satisfied despite the lack of detailed allegations regarding the connection between HCPs sold to Toyota, on a model-by-model basis developed for three years before production begins, and those purchased by DPPs.  To link their purchases of HCPs to the alleged conspiracy, DPPs link their purchases to the conspiracy with an allegation that Tiffin and Fleetwood purchased HCPs in the United

16

States from one or more of the Defendants or their co-conspirators, and that the anticompetitive conduct impacted the independent bid process, resulting in supracompetitive prices.  (Doc. No. 45 at ¶ 65).  Further, DPPs allege that the conspiracy was intended to and did affect the sales prices of HCPs to buyers in the United States, not just to Toyota. (Doc. No. 45 at ¶ 71).  According to DPPs, the winning bid is used even for suppliers outside the bidding process because, at a minimum, they pay the winning bid price.  (Id. at ¶ 72).

In addition, DPPs conclude that these facts create joint and several liability. They rely on Paper Sys., Inc. v. Nippon Paper Indus., 281 F3d 629 (7th Cir. 2002) (reversing dismissal of manufacturer that had not sold directly a plaintiff), a case addressing the effect of joint and several liability on the analysis of damages in an antitrust lawsuit.  The plaintiffs alleged that five manufacturers conspired "to reduce output and raise prices in the thermal facsimile paper business." Id. at 631.  Because the defendants used different distribution systems to sell paper, a particular plaintiff might be a direct purchaser of one defendant but not the others. Id. at 632.  The court concluded that only direct customers could recover damages for overcharges from a particular defendant, but because the defendant's status as a member of a cartel remained undetermined, it remained in the case as "jointly and severally liable for the entire overcharge" caused by the conspiracy. Id. at 634.

The allegations, when viewed in the light most favorable to DPPs satisfy their burden.  In sum, DPPs have "causally linked" their antitrust  injury to "an illegal presence in the market."  Brunswick v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977).  They allege they paid a higher price for HCPs purchased from Defendant than

17

they would have paid absent the alleged conspiracy.  In re Titanium Dioxide Antitrust Litig., No. 10-0318, 2012 WL 3711890, at * 10 (D.Md. Aug. 28, 2012) (citing Hanover Shoe v. United Shoe Mach. Corp., 392 U.S. 481, 489 (1968)).

### C.  Sufficiency of the Fraudulent Concealment Allegations

DPPs filed the initial HCP complaint on June 28, 2012, and allege a conspiracy from at least as early as January 1, 2000.  Collective Defendants maintain that any claims for damages suffered from the conspiracy before June 28, 2008, are barred because the statute requires claims be brought "within four years after the cause of action accrued." 15 U.S.C. § 15b; Klehr v. A.O. Smith Corp., 521 U.S. 179, 189-90 (1997).

Whether the claims prior to June 2008 are barred turns on whether the statute was tolled by the fraudulent concealment doctrine.   A plaintiff must plead three elements to establish fraudulent concealment:

> (1) wrongful concealment of their actions by the defendants;
> (2) failure of the plaintiff to discover the operative facts that
> are the basis of his cause of action within the limitations
> period; and (3) plaintiff's due diligence until discovery of the
>  facts.

Dayco Corp. v. Goodyear Tire & Rubber Co., 523 F.2d 389, 394 (6th Cir. 1975).  A plaintiff must plead the factual allegations underlying a claim of fraudulent concealment with particularity.  Friedman v. Estate of Presser, 929 F.2d 1151, 1160 (6th Cir.1991). Because DPPs' failure to discover the operative facts during the limitations period is not at issue, the Court limits its discussion to the two disputed elements.

### 1.  Wrongful Concealment

To show "wrongful concealment," a plaintiff must show something more than

18

silence or an unwillingness to reveal wrongful conduct.   Hamilton Cnty. Bd. of Comm'rs v. Nat'l Football League, 491 F.3d 310, 319 (6th Cir. 2007); Browning v. Levy, 283 F.3d 761, 770 (6th Cir. 2002).  A plaintiff must allege the existence of a "trick or contrivance intended to exclude suspicion and prevent inquiry." Pinney Dock & Transp. Co. v. Penn Cent. Corp., 838 F.2d 1445, 1467 (6th Cir. 1988) (quotation omitted).

Notably, the allegations found to be sufficient for wrongful concealment in Carrier Corp. v. Outokumpu Oyj, 673 F.3d 430, 446-47 (6th Cir. 2012), were not extensive.  In that case, the  plaintiffs relied on findings from the European Commission that conspirators "established security rules to prevent a paper trail. . .and used a coding-system to hide the identity of the producers in their documents and spreadsheets." Id. at 447.  These allegations satisfied the Sixth Circuit, inasmuch as they demonstrated "active steps to hide evidence, as opposed to simply meeting in secret."  Id. at 447 (citing Bridgeport Music, Inc. v. Diamond Time, Ltd., 371 F.3d 883, 891 (6th Cir. 2004) (explaining that "hiding evidence" can constitute affirmative concealment)).

Here, DPPs allege that the earliest notice was February 2010, the date that several Defendants were raided.  There was no information in the public domain about the rigged bids for HCPs; Defendants met and communicated in secret, and agreed to keep the facts from discovery.  (Doc. No. 45 at ¶¶ 96, 100).  Defendants represented publicly that their pricing and bidding activities were unilateral, thereby misleading Plaintiffs.  (Doc. No. 45 at ¶ 101).  Defendants used code names and met at private residences or remote locations (Doc. No. 45 at ¶¶ 108-109).  Defendants represented to customers and others that the pricing and bidding activities were unilateral, thereby misleading DPPs as to the true, collusive, and coordinated nature of Defendants'

19

activities relating to bid rigging, customer allocation, and price-fixing (Doc. No. 45 at ¶ 100), and Defendants affirmatively concealed their conduct when the antitrust investigation became public.

The Court found similar allegations sufficient to demonstrate wrongful concealment in the wire harness case, see In re Auto. Parts Antitrust Litig., 12-MD-02311, 2013 WL 2456584 (E.D. Mich. June 6, 2013), and Defendants have not provided grounds for distinguishing the situation here from the decision in the wire harness case. The Court finds that DPPs have met their burden to show wrongful concealment.

### 2. Due Diligence

In deciding whether DPPs have satisfied their burden as to this element, the Court again uses the decision in Carrier Corp., 673 F.3d at 448-49  (declining to hold that the plaintiffs' efforts were insufficient to satisfy the third element "at such an early stage of litigation and without the benefit of discovery." to guide its analysis) (citing Jones v. TransOhio Sav. Ass'n, 747 F.2d 1037, 1043 (6th Cir.1984) (noting the panel's reluctance to dismiss fraudulent concealment allegations prior to discovery). See also Duncan v. Leeds, 742 F.2d 989, 993 (6th Cir. 1984) (addressing the need to construe allegations of fraudulent concealment liberally and in the plaintiff's favor at such an early stage in the litigation). The Sixth Circuit deemed dismissal appropriate if, and only if, "it is obvious from the complaint that the plaintiff conducted absolutely no investigation."  Id. (citation omitted).   Actions that would deceive a reasonably diligent plaintiff toll the statute.

In Carrier Corp., the Sixth Circuit was satisfied that due diligence had been

20

pleaded because the plaintiff detailed the steps it had taken once it became aware of the EC investigation.  See 673 F.3d at 448.  In the ACAC, DPPs allege that they had no knowledge and that they could not have discovered the conduct earlier through the exercise of reasonable diligence.  (Doc. No. 45 at ¶ 95).  There is no argument advanced that DPPs ignored available information that would have aroused suspicion and prompted an investigation.  In sum, DPPs have included allegations as to each element that must be proven to toll the statute of limitation.

### D.  Sufficiency of the Injunctive Relief Request

DPPs ask the Court for an injunction preventing Defendants from "continuing and maintaining" the price fixing conspiracy.  (Doc. No. 45, Prayer for Relief at ¶ D). The request is authorized under the Clayton Act, which provides that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws."  15 U.S.C. § 26.

In challenging the request, Collective Defendants argue that the ACAC lacks the factual support necessary to establish a real or immediate threat that DPPs will be harmed again.  Specifically, Collective Defendants contend that DPPs were not the target of antitrust activity and any real threat of future harm has been eliminated by the guilty pleas.  The Court addressed the same arguments in the wire harness case.  The analysis applies with equal force to the HCPs complaint.

DPPs have alleged facts from which a "cognizable danger of recurrent violation" can be inferred.  See  United States v. W. T. Grant Co., 345 U.S. 629, 633 (1953). Specifically, DPPs allege a decade-long global conspiracy in a market with high barriers

21

to entry.  The same market conditions exist today.  <u>See</u> In re Static Random Access

Memory (SRAM) Antitrust Litig., 264 F.R.D. 603, 611 (N.D. Cal. 2009) (certifying a

nationwide class for injunctive relief based upon similar allegations).  The fact that

some Defendants have pleaded guilty does "not obviate the threat that a conspiracy will

persist or resume in the future."  In re TFT-LCD (Flat Panel) Antitrust Litig., 267 F.R.D.

583, 597 (N.D. Cal. 2010) <u>amended in part</u>, M 07-1827 SI, 2011 WL 3268649 (N.D.

Cal. July 28, 2011) (certifying a nationwide injunctive class under Rule 23(b)(2)).

## V.  CONCLUSION

For the reasons discussed above, the Court **DENIES** the motion.

**IT IS SO ORDERED**.

s/Marianne O. Battani<br>
MARIANNE O. BATTANI<br>
UNITED STATES DISTRICT JUDGE

DATE: <u>April 30, 2014</u>

CERTIFICATE OF SERVICE

I hereby certify that on the above date a copy of this Opinion and Order was served upon
all Counsel of Record via the Court's ECF Filing System.

s/Bernadette M. Thebolt<br>
Case Manager
